**STATE v HERBERT**

Ohio Appeals, 7th Dist, Columbiana Co

Decided Oct 31, 1936

George L. Lafferty, Prosecuting Attorney, Lisbon, Frank W. Springer, Ben L. Bennett, East Liverpool, and John L. Bauknecht, East Palestine, for appellee.

W. H. Vodrey, East Liverpool, Raymond Buzzard, East Liverpool, Charles Boyd, East Liverpool, and J. Ward Herbert, for appellant.

## OPINION

By NICHOLS, J.

S. T. Herbert was indicted by the grand jury of Columbiana County, Ohio, for the embezzlement of $500 of the funds of The Union Savings & Loan Company of East Liverpool, Ohio, on or about May 18, 1931, while he was acting in pursuance of his duties as secretary and director of the company. The indictment was drawn under the provisions of §12467, GC.

Upon the trial a verdict of guilty was returned by the jury, and judgment entered thereon by the court after overruling a motion for new trial, and the defendant, S. T. Herbert, appeals to this court for a reversal of that judgment on questions of law.

As disclosed by the record, in November of 1928 one J. C. Lutton was indebted to The Union Savings & Loan Company on two notes, and to secure the same had given two mortgages, in the sums of $312 and $1500 respectively. The property described in these mortgages was known as 772 Minerva Street, East Liverpool, Ohio. In the early part of November, 1928, these two mortgages were foreclosed and the property sold by the sheriff to The Union Savings & Loan Company. In the latter part of November, 1928, a deed from The Union Savings & Loan Company to one Elmer Howlett, purporting to convey the property at 772 Minerva Street, East Liverpool, Ohio, was executed and later placed upon the records of Columbiana County. At the

same time this deed was made to Elmer Howlett the records of the loan company show that a loan was made to Elmer Howlett in the amount of $2000. This amount was placed to the credit of Elmer Howett on the books of the company, and checks were drawn upon the account for a sum sufficient to pay the amount due on the Lutton notes and mortgages, leaving a balance of about $300 in the Howett account. When this purported loan was made by the company to Elmer Howett a note for $2000 was executed, purporting to be signed by Elmer Howett and secured by a mortgage purporting to be executed by Elmer Howett, the mortgage being made to the loan company and placed upon the mortgage records of the county. The property at 772 Minerva Street, East Liverpool, remained in the name of Elmer Howett until on or about May 18, 1931, when it was sold to Mr. and Mrs. William Schmidbauer, who agreed to pay $3150 therefor, out of which was paid the note and mortgage formerly given by Howett to the loan company, and certain other costs and expenses, and the balance placed to the credit of the account of Elmer Howett on the books of the company. Out of this balance in the name of Elmer Howett two checks were issued, one to S. T. Herbert for $500 and another to G. Y. Travis for $500, Herbert then being the secretary and a director of the loan company, and Travis being its president and a director. It is the claim of the state that this payment of $500 to Herbert out of the account standing in the name of Elmer Howett on the books of the loan company constituted embezzlement of that amount from The Union Savings & Loan Company. The record discloses the existence of a person by the name of Elmer Howett, who resided at Dayton, Ohio, but that when the deed was made from The Union Savings & Loan Company to Elmer Howett, the grantee in this deed knew nothing of the conveyance of the property to him. Elmer Howett did not sign any note or execute any mortgage to the loan company, but Herbert signed the name "Elmer Howett" to the note and mortgage, and signed the name of "Elmer Howett" to the note and mortgage, and signed the name of "Elmer Howett" likewise to the checks upon the account standing in the name of "Elmer Howett" upon the books of the company. Before the sale of the property to the Schmidtbauers, Elmer Howett had died. Nevertheless Herbert signed the name of Elmer Howett to the deed which was ex-

ecuted to the Schmidbauers, signed the name of Elmer Howett to the checks made in payment of the Howett note and mortgage, and to checks payable for other charges and expenses in connection with the transfer, and Herbert also signed Elmer Howett's name to the check which Herbert received for the $500 above referred to, and Herbert likewise signed the name of Howett to the check which Travis received for the $500. It was the claim of Herbert upon the trial that the $500 paid to him out of the Elmer Howett account and the $500 paid to Travis out of this account, were in payment of certain commissions which were claimed to be due from the loan company to Herbert and Travis for their services in making sales of a number of pieces of real estate which had been handled in the same manner by the execution of so-called John Doe or fictitious deeds, mortgages, notes and checks. S. T. Herbert admits the receipt of $500 in the manner hereinabove indicated. It was, of course, incumbent upon the state to prove that the receipt of this money constituted embezzlement from The Union Savings & Loan Company. The defendant did not deny, and it seems to be conceded from the record, that the placing of the title to the so-called Lutton property in the name of Elmer Howett, and the further transactions in connection therewith, all were made upon the theory that the property was actually owned by the loan company, and it is not denied that the money standing in the name of Elmer Howett in the running account upon the books of the company was money belonging to The Union Savings & Loan Company and not to Howett.

For the purpose of proving intent, purpose and design upon the part of Herbert to embezzle this $500 from The Union Savings & Loan Company, the state, over the objection of the defendant, offered in evidence approximately ninety-three deeds and mortgages which had been executed by Herbert to fictitious persons, or at least to persons who may have been in existence at the time but who knew nothing of the transactions. And for the same purpose the state offered evidence showing the execution of various notes, mortgages and checks wherein Herbert had signed fictitious names thereto. To the introduction of these so-called John Doe and fictitious deeds, notes, checks and mortgages defendant objected, but the same were admitted by the trial court and exceptions noted upon behalf of the defendant.

It is the claim of the defendant that the introduction of ninety or more of these fictitious deeds, notes and mortgages was prejudicial to him for the reason that he admits that he received the $500 in question out of the account standing in the name of Elmer Howett, and admits that the money in this account belonged to The Union Savings & Loan Company. And it is the position of the defendant, or claim upon his part, that the only question to be decided by the jury in this case was whether he was actually entitled to this money as commission upon real estate which he had formerly sold for the loan company, or whether he embezzled this sum as charged. We are told in oral argument that counsel for Herbert admitted in the opening statement to the jury all of the above related facts with reference to the transaction involving the property at 772 Minerva Street, East Liverpool, Ohio, and admitted the receipt of the sum of $500 in the manner hereinabove related. We do not have before us in this proceeding the opening statements of counsel to the jury, and we are therefore unable to consider whether counsel for the defendant did make these admissions. But upon an examination of the record we do find that counsel for the defendant persistently objected to the introduction in evidence of these ninety or more fictitious deeds and mortgages. It is urged that the admission thereof constituted error prejudicial to the defendant.

It is the claim of the state that §13444-19, GC, expressly authorizes the admission of this evidence. This section is as follows:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

So far as applicable to the case which was being tried in the Common Pleas Court it is clear that the only purpose for which evidence of collateral acts or offenses may be received, is to show the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act for which he has been indicted.

It is the claim of counsel for defendant that except in two instances wherein fictitious or John Doe deeds, notes and mortgages had been executed by him, the state failed to prove that any money had been received by him in connection with these transactions, and it is contended that approximately ninety of these transactions are not material, are not like. acts to that charged in the indictment, and were improperly admitted in evidence. It is true that the state did not show that in any instance other than the Howett transaction and one other, did Herbert receive any money as a result of the execution of these fictitious deeds, notes, checks and mortgages. But it is noted that §13444-19, GC, does not limit the state to the showing of other offenses, but authorizes the showing of any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant. It is apparent that the acts sought to be proved by the state need not necessarily, in themselves, constitute proof of the commission of another crime by the defendant; it is recognized that such acts may only tend to show the commission of another crime. In view of the peculiar circumstances leading up to the admitted fact that Herbert received $500 as a result of one or two of these fictitious transactions, we are of the opinion that evidence of a reasonable number of other like acts and transactions were properly admissible upon the trial. We are, however, impressed with the argument of counsel for the defendant that the admission of these fictitious deeds, notes and mortgages in such great numbers, as was done in this case, tended to overshadow the real issue, and may have placed Herbert in the situation that he was being tried for a series of improper acts in the management of this loan company, when the only issue to be determined by the jury was whether he had embezzled $500 from the company on or about May 18, 1931, while acting as secretary and director of the company.

My associates, Judges Carter and Roberts, hold that the admission of evidence of all these fictitious transactions ▮▮▮▮▮▮ had the effect to overshadow the real issue in the case, and the trial court abused its discretion by not limiting the evidence to the admission of a reasonable number of such transactions, and that this abuse of discretion upon the part of the trial court constituted error prejudicial to the accused. While I am inclined to think that it was unnecessary to encumber the record with proof of all of these ninety or more fictitious transactions, I am not prepared to say that the court committed prejudicial error in admitting all of them in view of the fact that by the charge of the court the admission thereof was properly limited to the purposes stipulated in §13444-19, GC. We find nothing in the record wherein the defendant below, prior to the introduction of all these fictitious deeds, notes and mortgages, had admitted the fictitious character thereof, other than the Howett transactions.

As another ground for the reversal of the judgment of the lower court, it is contended by counsel for defendant that the trial court erred in excluding certain material and relevant evidence offered on behalf of the defendant, and which consisted of the rejection by the court of certain evidence given by G. Y. Travis in his deposition taken during the course of the trial, Travis having become ill and unable to remain in attendance at the trial. It is contended that the testimony of Mr. Travis which was stricken out by the trial court tended to show that all the fictitious deeds, notes and mortgages which the state had introduced in evidence and to which we have hereinbefore referred, were executed by Mr. Herbert pursuant to directions of the board of directors of the company, and in pursuance of a purpose on the part of the company to keep it from appearing to the public that the company had acquired a large amount of real estate of which it was unable to dispose, and that all these transactions were in the interest of keeping the company in the confidence of the people of the community.

Upon the taking of the deposition of Mr. Travis, after showing that he was president, director and attorney for The Union Savings & Loan Company, he was examined as follows by counsel for the defendant:

"Q. Will you please state what association your Building and Loan had with The Peoples Building and Loan?

Mr. Bauknecht: Objection.

The Court: Overruled.

A. Well, after the death of M. E. Miskall, it was merged with The Union Savings and Loan. * * * And continued on then under the name of The Union Savings and Loan.

Q. What did you do in relation to their assets and their liabilities? That is, the assets and liabilities of the Peoples?

Mr. Bauknecht: Objection.

A. Well, the assets were taken over by The Union Savings and Loan and the liabilities were assumed by The Union Savings and Loan Company.

Q. Yes. Some mention in this case has been made of John Doe mortgages in connection with The Union Building and Loan. Will you please tell us what, if anything, you know of such mortgages and such deeds?

Mr. Bauknecht: Objection.

The Court: Objection sustained.

Mr. Vodrey: Your Honor, the case is replete with the term brought in on the part of the State. The case abounds with testimony regarding John Doe mortgages; they are introduced here and are called that.

The Court: Anything that has been passed by the Board of Directors so that it would become a policy of the Company would be competent, but a mere suggestion by a member of the Board of Directors would not be competent.

Mr. Vodrey: I think the testimony will show, Your Honor, that they were used with the knowledge of the Board of Directors and adopted by the Board of Directors.

The Court: If you can show any adoption, I will allow the testimony, but this answer does not show it.

Mr. Vodrey: No, we are not to that point yet, but the State itself has brought that in, and the testimony tells time and time again of John Doe mortgages.

The Court: At this time this answer will be excluded. It is excluded to the bottom of page nine.

Mr. Vodrey: Please note an exception to the ruling of the Court excluding witness' answer to the question regarding John Doe mortgages. The witness, if permitted to testify, would testify as follows: 'Well, there were some such deeds and mortgages. I don't know just how many. But after we were merged—or after The Peoples Building & Loan was merged with

The Union Building & Loan, Mr. Smith Fowler, who was one of the Directors in The Peoples Building & Loan, became a member of the Board of Directors of The Union Savings & Loan, at the time of the merger brought up the question of real estate that was being acquired, and suggested that it be carried in the name of John Doe holders rather than in the name of the Company; that he thought it was better for the Company not to have too much real estate in their name, and that it should be carried in the name of John Doe holders.'

The Court: Those next questions are excluded also down to the bottom of page nine.

Mr. Buzzard: If Your Honor please, will you show us just exactly where on page nine? (The Court indicated). The defendant excepted to the exclusion of the following part of said deposition:

Q. When or where, if you can recall, was that statement of Mr. Fowler's made? A. It was made at a meeting of the Board of Directors.

Q. Were you present at that meeting? A. Yes.

Q. Was Mr. Herbert present at the meeting? A. Yes."

Keeping in mind that the court had admitted, for the purpose of showing the intent of the accused to commit the crime in question, evidence of some ninety transactions that were in John Doe or fictitious names, and which had been made or used by Mr. Herbert in connection with his management of the affairs of the loan company, it is apparent that this refusal of the trial court to permit the defendant to introduce evidence tending to explain these transactions and tending to remove from the minds of the jury any belief which they might have that these transactions were all a part of a scheme or plan of Mr. Herbert to embezzle the funds in question, we are of opinion that the court clearly erred in excluding this testimony, and to the prejudice of the defendant.

It is the claim of counsel for the state that the defendant could not introduce evidence of conversations had by the directors at their meetings for the purpose of showing the action of the directors of the company but that the only way in which the action of the board of directors could be shown was by the introduction of the minutes of the meeting of the board; and that unless these minutes should show that the directors had authorized the execution of these John Doe or fictitious deeds and mortgages it would not be the act of the loan company. The court adopted this reasoning of counsel for the state and thereby precluded the defendant from any explanation as to all of these so-called fictitious transactions. Another reason advanced by the state as authority for the rejection of this testimony was that it would merely tend to show that the directors had authorized an illegal act or acts in connection with the execution of these John Doe or fictitious deeds and mortgages, and that, therefore, such illegal acts of the directors would be no justification for the conduct of the defendant. We do not countenance the manner in which the affairs of this company were carried on; neither do we find any express enactment of the Legislature whereby they were prohibited at the time these fictitious deeds, notes and mortgages were executed. It seems apparent that some practice of this kind had become prevalent in the state, or at least that there were evident reasons for fearing that such practice would become prevalent, as the Legislature has subsequently enacted legislation to the effect that no building and loan association "shall permit title to any real estate or any undivided interest therein of which it is in fact the owner, or the consideration for the purchase or other acquisition of which shall have moved directly or indirectly from the association, to be or remain vested of record, or be carried on the books of the association, in the name of any other corporation or person, except with the written approval of the superintendent. No association shall take a purchase money mortgage for all or a substantial part of the purchase price of any real estate except in the case of a bona fide sale of such real estate to the purchaser or purchasers executing such purchase money mortgage." See §9655, GC (115 Ohio Laws 378, effective June 29, 1934).

Keeping in mind that the defendant had been indicted for the single offense of embezzlement of $500 on or about May 18, 1931, and further having in mind that the court permitted the introduction of evidence of some ninety transactions or acts on the part of the defendant wherein like fictitious deeds, notes and mortgages were made, signed and executed, which evidence was admissible solely for the purpose of showing motive or intent, scheme or design, on the part of the defendant in the commission of the crime with which he was indicted, it becomes quite apparent that the failure of the court to permit the ac-

cused to explain these transactions by showing that they were all innocently done in pursuance of the business of the company and without any purpose, intent, design or scheme to embezzle funds by the accused from the loan company, deprived defendant of a substantial right, proper for his defense, and even though the court later admitted testimony of the same character, given by defendant when he went on the stand to testify in his own defense, yet we are clearly of the opinion that he was not required to rely merely on his own explanation of these transactions, but should have been permitted to explain them by the testimony of the president of the company, Mr. Travis, who was also a director and attorney for the company. Evidence of these collateral acts was not admitted as substantive evidence to prove the commission of the offense of which the accused was on trial, and we may well believe that if the accused had been able to offer evidence sufficient to satisfy the jury that there was no design, intent or purpose upon the part of the accused to embezzle funds of the company when these fictitious or John Doe deeds, notes and mortgages were made and executed, that these acts were all done openly, above board, with the knowledge and consent of the directors of the company and its officers, and in pursuance of some reasonable course of conduct in the management of its business, the result of the jury's verdict might have been otherwise than guilty. And especially is this true in view of the fact that the state failed to prove that the defendant below had himself received any profit or benefit out of about ninety of these fictitious transactions, and not until after the period of four years from the time that the first fictitious or John Doe transaction took place. . We are clearly of the opinion that defendant was not limited to the minutes of the board of directors for the █ purpose of showing what actually took place at the meetings of the board of directors upon the subject of the taking and execution of these fictitious or John Doe deeds, notes and mortgages, but that the defendant could properly show what actually took place at these meetings of the directors by any available evidence.

From the syllabus of the case of Daggett v St. Paul Tropical Development Co., 141 Minn., 51, 169 NW 252, we quote:

"A party dealing with a corporation is not bound by the record of the transaction subsequently entered in the corporate books, but may show what actually took place by any available evidence. The same rule applies where the corporation deals with a member of the corporation as an adverse party."

From the case of Lawrence v Premier Indemnity Assurance Co., 180 Cal. 688, 182 P. 431, we quote from the opinion at page 697:

"Plaintiff's counsel contend that testimony showing that something took place at the meeting other than as shown by the minutes is not admissible under the 'parol evidence' rule. But minutes of a meeting are not a written instrument. Their function is merely to act as a written record of what took place at the meeting. That record may be true or it may not be, and in the absence of the element of estoppel, as where a party has acted in justifiable reliance upon the minutes, it is permitted to the corporation or to any one else to show what actually did take place at the meeting. * * * 7 Ruling Case Law, 154."

"The fact that the minutes of a meeting, which were made by the secretary of a loan association, do not state that the preference for a loan was offered to open competition is not conclusive that such preference was not procured by competitive bidding, and the omission may be supplied by oral testimony as to that fact, provided it does not contradict the minutes." Hotchkiss v Norwood Park Bldg., Loan & Homestead Assn., 229 Ill. 248, 82 NE 257, paragraph four of the syllabus.

We recognize the rule in some jurisdictions that where the minutes of a directors' meeting have been reduced to writing in a book kept for that purpose by the corporation, that the record itself is the best evidence of what took place at the meeting; but where it is clear as █ in the case we now have under consideration, that no record of the minutes of the meeting was made or kept, parol evidence of the business transacted at such meeting is competent. The broad general statement that secondary evidence of the books and papers of a corporation is inadmissible where the originals are available, has no application to the case at bar.

From the annotation found in 66 A.L.R. 1328, we quote from subdivision III, page 1333, as follows:

"Accordingly, it has been held that where the record of a meeting of directors, stockholders, or members of a private corporation or association fails to show a certain action, or does not purport to be a complete record of the meeting, oral evidence is admissible to supply the omission."

Many cases are cited in the above annotation which support this proposition.

Aside from being permitted to offer parol evidence of what took place at the meetings of the directors of the savings and loan company for the purpose of showing that the company for its own purposes had, by action of its directors, adopted the practice of taking and executing fictitious or John Doe deeds, notes and ▉▉▉▉ mortgages, we think that it was entirely proper for the defendant to submit proof of statements or acts of its officers and directors not made at a meeting of the board of directors, but which had a tendency to show a custom of the savings and loan company for some reason not unlawful or prohibited to receive and execute such fictitious deeds, notes and mortgages. The defendant should not have been deprived of any evidence which would have the effect of explaining that his acts and conduct in relation to these fictitious transactions were with no intent, motive or design to defraud or embezzle, or in pursuance of any scheme to that end. We need not analyze further the claim of appellant that prejudicial error intervened in the exclusion of this evidence tending to explain his acts and conduct.

By the procedure adopted by the trial court in refusing the accused the right to introduce this evidence tending to explain the execution and delivery of these fictitious or John Doe deeds, notes and mortgages, thereby to show that these transactions were not for the purpose or intent of laying the foundation for the crime of embezzlement charged in the indictment, the court apparently harkened back to the jurisprudence of England in the 15th century when in a criminal trial the crown could adduce witnesses, but an accused could not put in evidence to show his innocence. We have traveled far from that day, and the advanced and enlightened system of jurisprudence under which we are now governed guarantees to an accused the right to offer and have received as evidence in his behalf all material and relevant evidence of a probative value for his defense.

As hereinbefore stated, appellant claimed that the $500 which he received from the account standing in the name of Elmer Howitt upon the books of the savings and loan company and the $500 received by Mr. Travis, the president of the company, was in part payment of commissions owing by the savings and loan company to Mr. Herbert and to Mr. Travis. With utter inconsistency to the ruling of the court in excluding evidence of the plan and custom of the savings and loan company with reference to taking and executing fictitious deeds, notes and mortgages, the trial court admitted in evidence oral testimony that at meetings of the board of directors not shown by any minutes thereof, the directors had agreed that Mr. Herbert and Mr. Travis should receive certain commissions upon any real estate of the company which these gentlemen would negotiate and sell and that likewise the directors had consented and agreed to the payment of these commissions. We think this evidence was entirely competent, and that the court's action in that behalf was right; but we are unable to see any reason for the distinction made by the court for the exclusion of oral evidence as to certain of these matters and admitting oral testimony as to other transactions.

Another of the errors assigned by counsel for the appellant upon which it is claimed this court should reverse the judgment of the trial court, is the misconduct of juror number one, Mr. E. J. Adams, who was the last juror accepted in the panel. On his voir dire examination Mr. Adams was asked the following questions and in response gave the following answers:

"Q. Did you ever have any dealings with any of the Directors of that Loan Company? A. No, sir.

Q. Is there any reason at all, Mr. Adams, that you think of now, since you have been seated here, and going back over the questions, too, that were asked of other jurors while you were out in the audience, has there anything come up in your mind, anything that you feel should be disclosed so that we may determine whether you should sit as a juror? A. No, sir.

Q. You don't think of anything? A. No, sir.

Q. Did you say you have had any trouble with any Building and Loan or any bank or any financial institution? A. No, sir.

Q. You never had any trouble with them? A. No, sir."

It is claimed that on the basis of his voir dire examination, Mr. Adams appeared to

be a qualified juror, and for that reason defendant did not challenge him for cause or exercise his remaining peremptory challenge.

Upon the motion for a new trial it was shown by affidavits and oral testimony, that five days before the commencement of the trial this juror, together with two other gentlemen composing a committee representing a certain organization of which the juror Adams and the other two gentlemen were members, Adams being the president of the organization, called at the office of the building and loan company and there had a conference with Mr. Cole, the new secretary of the company, relative to the title to certain property which the organization was purchasing under land contract from The Union Savings & Loan Company. And it developed that the identical property occupied by the organization of which Mr. Adams was president was one of those wherein the title had been taken by the savings and loan company in the name of a fictitious person, and that in the conversation between the committee and the secretary of the savings and loan company this juror had learned that there would be difficulty in clearing the title to the property which was being purchased by the organization of which he was president, and that this difficulty was due to the act of defendant in taking title in the name of a fictitious person. We think it clear that defendant had a right to a jury of twelve disinterested persons, and the fact that Mr. Adams was president of the organization which was purchasing property from the savings and loan company, and that there would be difficulty in clearing the title to this property, placed Mr. Adams in such situation that he was not free from influence or prejudice; that the evidence of all these ninety fictitious transactions would bear with great force upon Mr. Adams because of his personal knowledge and interest in one of the very transactions offered in evidence for the purpose of showing the intent, motive or design of the accused. It is urged by counsel for the state that the inquiry of Mr. Adams was only as to whether he had ever had any dealings on his own account with the directors of the loan company. But we do not conceive that the inquiry made of Mr. Adams was limited in any way to his personal dealings, but was reasonably made for the purpose of developing whether he had had dealings of any kind, whether as an individual or member of the organization of which he was president, with the

directors of the loan company. The meeting and conversation had by him in the office of the company having occurred but five days previous to his voir dire examination, we think he could not have but remembered this transaction, and that he should have made disclosure thereof upon the voir dire examination. And in view of the evidence offered upon the motion for a new trial, we find and hold that the Common Pleas Court committed prejudicial error in overruling the same, because of the misconduct of the juror Adams on the voir dire examination.

The appellant further urges in this case that counsel for the state was guilty of prejudicial misconduct in the closing argument to the jury wherein counsel made the following statement: "Why, $10,000 would not cover the damage he has done." Counsel for the state claimed that this statement was made in answer to argument of counsel for the accused wherein the counsel for the accused had stated that no harm or damage had come to the savings and loan association by reason of all these fictitious transactions to which we have hereinabove referred. We do not have the argument of counsel for the accused before us, and it may well be that the statement made by counsel for the state was properly made in answer to that which had gone before on behalf of the accused. We note that after counsel for the state had made the comment that $10,000 would not cover the damage that defendant has done, Mr. Vodrey, of counsel for the accused, asked if that was in the evidence, and Mr. Bauknecht, counsel for the state, answered: "That is in answer to your argument." There was no motion asking the court to instruct the jury to disregard the statement of counsel, and we must assume that counsel for the accused was satisfied that the objectionable statement was made in answer to something he himself had argued. We find no prejudicial error in this respect.

There are some further claims made in the brief of counsel for the appellant, one being to the effect that the court permitted incompetent questions to be asked by counsel for the state upon cross-examination of certain witnesses who had testified as to the good reputation of the accused. We quote a part of the objectionable testimony.

"Q. (By Mr. Bauknecht). I just want to ask you one more question. If a banker or a man entrusted with the care of someone's money was to put fifty-four fictitious

mortgages in the files, would you say he was of good reputation?

Mr. Vodrey: To which we object.

The Court: Overruled.

Mr. Vodrey: Exception.

Q. Would you, Mr. Hepburn? A. No, sir."

It is claimed that it was thus shown that the evidence of the execution of all the John Doe or fictitious deeds and mortgages was used as substantive evidence, or at least evidence for a purpose other than showing the intent, motive or design of the accused. There is some foundation for complaint as to this testimony. All to which the witness Hepburn had testified was the reputation of the accused. He was not testifying as to the character of the accused. But the admission of this evidence would not be such as of itself to warrant a reversal of the judgment of the trial court.

We have considered all of the errors assigned and find that the trial court committed error prejudicial to the rights of the appellant in the exclusion of competent, relevant evidence, and that prejudicial error intervened in the overruling of the motion for a new trial because of the misconduct of the juror, Adams, upon the voir dire examination, and abused its discretion, as to the number of fictitious transactions admitted to show the intent, design or scheme of the accused; and for these prejudicial errors the judgment of the trial court must be, and the same is, reversed.

Judgment reversed.

CARTER, PJ, and ROBERTS, J, concur.